Alright, we're going to cover 450 visions now. Thank you. I'm your host, Mr. Chairman. Paul Johnson, take it away. Don't mention it. Okay, please be seated. Good morning, folks. If our clerk could call our case.  Good morning, folks. So, we have, as you know, we've read the briefs. We're familiar with the authorities cited therein and, of course, with the record. So you can take that into account with your comments this morning. We're going to allot 20 minutes of time with an additional five minutes for revolve for the appellant, so you don't need to reserve time. If, when you step up, if you could be kind enough to identify yourself, and also keep your voice up because the microphone records but does not amplify. And with that, we'll get started. Counsel for the appellant. Good morning.  I'm Patrick Sullivan, and my client is John Pond Majorski III. And following what we give in the briefs, because these are all family members, we'll use the informality of first names, not disrespecting anyone. May I please have the clerk? I'll start with the account law in July of 2014, Will, that was the jury case, where the trial court entered a directive verdict in 2024, after originally denying the directive verdict in his 2023 ruling. And as a directive verdict, was that the response, or was there a motion to reconsider? There was a motion pending, but it wasn't a motion to reconsider. And the trial court, at a hearing, actually on a privilege issue, on a privilege motion, he said that he wanted to revisit and was having second thoughts about directive verdict. He did ask for some more briefs. There's some more briefing that comes after the trial court says that, and his ruling is a few months later. It was his idea. That's a question of law. So, as you know, we get the inferences and all that. There's no deference due to any facts as viewed by the trial court. And here, in 2014, she's a multiple fiduciary. And I'll briefly argue how the special rule for fiduciary undue influence applies here. And in the context of directive verdict, the law in Illinois is that you cannot have a directive verdict if the plaintiff has a pre-nefastia case using those four factors in the DeHart precedent. And the four factors involve a fiduciary who benefits from the new will and who participates in the preparation. And if you have evidence of that from which a jury could render a verdict, you're entitled to an inference of undue influence without any extra proof. You don't need direct influence proof. And the NEMIF case makes clear that if you've got a pre-nefastia case with the four factors, you can't have a judgment as a matter of law. And that NEMIF is not a directive verdict. It actually harmed the court's decision. But a verdict is a directive verdict, so judgment is a matter of law. And if we have evidence of the four factors, the case goes to the jury. That kind of laid out in the discussion of the presumption in the IPI pattern jury instructions during the trial. It's a different framework during the trial. How will the plaintiff get an instruction about a presumption where the jury must find undue influence? It doesn't really boil it down to whether there's evidence that the preparation of the will was procured by the beneficiary, correct? Correct. That's the only one that gets reviewed. She's clearly a fiduciary. She's in the well. And I'll turn to that right now on the procuring element. So whether that procurement is the person that is instrumental or participated in the preparation, or they prepared it themselves, she didn't write the will, so it's preparation, participating in the preparation. And we have ample evidence that would support a finding of that. That's in the record. Now, further, if they concede that Lisa is the conduit between these attorneys, including the estate planning attorneys, and her father, and the argument and the assertion at the trial, well, it's only ministerial. She has no substantive involvement. So there's no question that she's the go-between. And she is discussing estate planning with the estate planning arm of the Perkins-Gruber. And also, during the course of that representation, first with Attorney Domingos, who first at McDermott, what is the evidence that she's discussing estate planning? There's some evidence that she's discussing and estate planning because of that church-church lawsuit and the settlement negotiations. But what's the evidence that she's communicating estate planning issues with regard to John? Well, we have the disputed May 10, 2014 email that had the purpose claim, and that's chief. And I know we're jumping around issues now, but one of the things that I've been trying to understand is you folks dispute whether the trial court conducted an in-camera or a redacted or unredacted email. And having done many in-camera inspections, I don't know why a judge would ever need to do one for redacted documents. The whole purpose of an in-camera is to determine whether the information that's been redacted is properly subject to privilege. So, I mean, it would seem to me that the judge would have had to have reviewed unredacted documents. Well, let me try to clear that up. So, the document that's in the record, there's an email chain. It's in the Supplemental Exhibit 3620 in Volume 4, and it runs through 3623. And there's multiple emails. Our argument is about the second email. It's from Domingo Soup. It's May 10 at 12.30 p.m. It's to Lisa and says, Eric Ransom-Brenner, the litigation attorney. And he adds to the subject matter some estate plan specifics. Now, regarding redacted, unredacted, well, the trial court looked at has redactions in it. But it's not all redacted. And our argument is that the text in Mr. Soup's email that we often see, it's here, it's right here, that shows that it's about the estate plan. Lisa writes to her litigation attorney about settlements. That's the first one. Mr. Soup, he's in the loop. He's feeding on the law. He's in the loop on all this litigation stuff. He jumps in. He jumps in. He says, hey, hey, let me tell my specifics so we are clear on my estate plan. And then he goes into detail, explaining to Lisa about the state of the estate plan. No, it's about trusts, a marital and a family trust on which John, the father, has, here, your father can exercise his power of appointment over the marital and family trust and leave nothing to JP3, John. So he's saying, hey, Lisa, your father can do this. He has the power to do this. The mother is dead at the time. And your father can exercise his power. Then the division is 25% to JP3, 75% to JP3. And, of course, it closes that with some redaction. Now is the time to have your father update his estate plan. So they argue this about the mother's estate plan. But the mother is gone, and it clearly is saying, your father needs to do something. If he doesn't do it, your brother is going to get money. But if he does do it, you'll get more money and your brother gets less. And this is Mr. Soup telling Lisa this. We need to do something. So it's not a privilege because of the testamentary exception. When Mr. Soup jumps into a litigation chain and starts talking about the estate plan, that part is not a privilege. I'm still not clear on, are you saying that the document that the judge reviews, and they can email that the judge reviews is the document that you have in front of you, which is the redacted document? And my question to you would be, why would a judge ever want to review a redacted document? Because the parties were fighting about the unredacted portion. They claim that the part was complete, but you're saying that the redacted portion, there was no dispute about that. Well, that's true. We judges, we don't know how to dispute it. We've never seen it. We review it for an in-camera inspection. Well, that's typically how we're viewed. That's right. I'm just picking up on the same point, that it's really not an in-camera inspection. The judges aren't reviewing anything of the parties that each side hasn't already seen. Well, on this sort of a reading, Your Honor, as to this document, he ruled. They had produced it, and they said, we didn't mean to produce it, and they claimed privilege on the unredacted part. The outside was arguing, this is not privilege, and you need to do an in-camera inspection. And that's what he found. So R-53 in the record is, he finds that what he can see is privilege, and is clawed back. So they get it back, and the privilege claim is upheld. We think that's abuse of discretion. That's wrong, as to what we can see from Mr. Suk. In addition, there was a broader motion, which he denied, saying, I don't know the rational basis. We'll take the law for the redaction. But what you read from that e-mail is the attorney, Suk, informing the parties in the e-mail what the trust document provides for, in terms of division of assets, correct? It does do that. And it says, and what else does it say? It says that your father can change it, and that he needs to update his estate plan to change it, and by change it, he means to further disinherit Charlie. Well, that's an inference you're drawing from that, right? Well, no, it says, close it. The time is coming to have your father update his estate plan, given the death of your mother. And early on, he says, well, the plan is to do is to exercise the powers of appointment, disinherit Charlie. And it's that e-mail. They talk about the other, you know, the first e-mail from Lisa to Mr. Graham from Brenner. You know, that's not what we're arguing. So we sidetracked about the e-mail. If you could get back to the question that we started with, which is the evidence that you have to show that Lisa procured this change in the will. Yes. And so Lisa, you know, for years she's working closely with these attorneys. She's the point of contact with the attorneys, estate planning attorneys and litigation attorneys. And if we just look at 2014, there was no evidence that John was asking to do anything with his estate plan. We see, you know, Mr. Soup talking to Lisa about it. And there is evidence that there's a conflict, right, between John and Johnny at the time? A conflict? Conflict. No, we don't agree with that at all. Do you stand there's no evidence of a conflict? Well, I won't say there's no evidence of it, but it's hotly disputed. Until 2012, when Lisa brings in her attorneys of choice, and then there's litigation, the record doesn't reflect the parents really understanding anything about the litigation. Is there evidence that they didn't understand what was going on with the litigation? Yes. So, it was July 2012 the lawsuit gets filed, and then Johnny, who's here with us out of the blue, no history, decades of working closely with the parents, he's being sued by his parents. And there was no hotel, no brothels, it's just the bank. And then he filed a guardianship. There were guardians at Lyham. And so the mother of the guardian at Lyham talked to her, and in that record, she didn't realize that a lawsuit had been filed. Leading up to the lawsuit being filed, there was a lot of communication back and forth between John's attorney and Johnny's attorney about getting financial records, getting disbursements to pay medical bills, care for Ann. I mean, that's Mr. Clyde McDermott-Wells and that team, Mr. Soup, working with Lisa. The record doesn't document John running the litigation lawyers and all of this. And it's in the briefs how some of that correspondence is saying things that just don't make any sense. They wrote to John's landlord, suggesting he was the attorney or something. And our position in the case, supported by the evidence, is that these are the lawyers Lisa brought in, and she's running it. And the mother doesn't even realize there's a lawsuit on file. The father of the guardian at Lyham, he didn't ask about the lawsuit, so we don't see a record of John being aware of the lawsuit right after it's filed. And the lawsuit was verified or signed by John and Ann, wasn't it? I think their signature is real here. But that's not conclusive evidence that they understood what was going on. Well, I think they understood what was going on. Is it their burden to show that John understood what was going on, or is it your burden to show that John didn't understand what was going on and he was influenced by Lisa in procuring the change? Our position is that there's conflicting evidence, and it permits multiple inferences. Can I ask a slightly different one? It's the interplay between your first issue that you identified earlier and the second issue. The second issue being that it was improper for the trial judge to enter a judgment on a trust account while it was not decided by the jury. For that to work, you have to win on issue one. That is to say, the trial court erred by selecting the burden. True? I agree. We also have the argument that the privileged e-mail and potentially other privilege, improperly privileged, if they're not privileged, that that's material evidence that could affect the outcome. So on count two, we have two arguments. But the constitutional argument is the jury on count one required the trial judge to wait on count two. And yes, that matters if there's going to be a jury on count one. Right. So you pointed to the e-mail. What other evidence do you have then? And you pointed to the fact that Lisa was involved with the lawyers. What other evidence do you have to show the undue evidence? Yes. We rely on the entire sequence from 2011 going forward where there's no history of any dispute between son and parents. And it all takes a significant turn. But there is a history of dispute. There's lots of disputes. No. As of 2011, there's not. When is it? July 2012, Your Honor. When's the church hearing? July 2012. Right. So you said there's no history of any dispute between 2011 and 2014? No, no, no. Until 2012. Until 2012. Right. And so in 2011, there's what we think is an important episode where 2010, Lisa brings in Mr. Suk. It doesn't stick. They don't go with Mr. Suk. In 2011, John, his own lawyer, has nothing to do with Johnny or Lisa, brings in his attorney, Patrick, again. And John hires Mr. Bagan. There's meetings with him. And as part of that, John tells Mr. Bagan, his attorney, that he does want to sell the properties to Johnny. And there was a proposal that was pending, and that's not treason in John's mind. He's willing to go forward with it, and he tells his own attorney that. And Lisa's in the loop on the discussions with Bagan, and when she finds out that John wants to go forward with this, she steps in. And she actively interferes with that attorney relationship, and she gets it shut down. She's holding the power of attorney at the time. Mr. Bagan wrote one for her. And so she says, Mr. Bagan, send the bill to me. I want the bill. If the bill had gone to the father, his bills were being paid from the company by Johnny, and Johnny would have seen the bills and would have paid them. He would have paid his father's bill. Instead, Lisa gets told to give me the bill. Doesn't pay it. Lawyer drops out. At the same time, she's communicating again with Mr. Suk. So this is mid-2011. And she's saying things like, you know, my mom and dad insisted they want you, Mr. Suk, to represent them. That's not true. And they didn't want Mr. Suk. And Johnny was the one unduly influencing the parents, pressuring them to do the sale, and they're cracking under his pressure. When in reality, John had his own attorney, Mr. Bagan, representing only him and not beholden to anyone else, and was working with that attorney to consider this sale proposal. So she shot that down successfully. And, you know, you don't pay the lawyer. He's not going to keep working. And then she gets Mr. Suk back in. It's fixed this time. Other than one meeting where Johnny was invited, he's totally up to the loop on that, but Lisa is in the loop. Then the mother gets really sick, is in hospital and in rehab. As she's coming out, Lisa has moved in. This is 2012. So Lisa has moved into the mother's apartment. Now Johnny's being, he's literally being locked out. He's, you know, he's got family relationships, social relationships, business relationships. No history of any problems in any of that. Lisa's in town. Lisa's in charge. She shuts it all down. Lisa herself is in open conflict with Johnny in 2012. That's when the gunman letter starts showing up. That's when the lawsuit comes in. Again, out of the loop. And other witnesses, as a trial, who the district court discovered, support Lisa's undue influence. The neighbor, Cheryl Lockwood, who testified. Just a reminder, counselor, your time is ticking down.  What do I have left to shoot? Oh, you have to say three minutes. Okay. And, yeah, so Cheryl Lockwood, Maria Mesa, and that set of witnesses show Lisa, you know, the parents do want to see Johnny. They're not in conflict with him. The conflict is hers and the attorney's. What about the fact that Mesa stopped working for John and Anne in 2012? Does that matter? I'm sorry, your Honor. Mesa stopped working for John in 2012, I believe. Right. Her will was changed in 2014. Yes. So, yes, so Lisa was instrumental in getting rid of Mesa. And in 2014, Lisa's handpicked team and she's completely isolated the father. So, the fact that Lisa is asking to have the will changed in 2012, there were a series of documents here. Late 2012 and 2013 is the father's trust goes 100% to her. And in 2014... Lisa's asking which evidence do you rely on to coordinate? Maria Mesa testified that before he was terminated, Lisa was bugging the father to change the will.   Let me just turn very quickly to that, to the constitutional argument. The response we treated is not real, but this is extremely well established in the federal cases. That the whole framework that predates the 1970 Constitution, that where you have the same issue, and it's just a quirk of Illinois law that trust goes to judge and will goes to jury. But here, the two documents are together. They're signed at the same time. They're identical circumstances. And the law does not allow, in a case, to say, well, the will is good, but their trust is no good. Because that brings us all into disrepute. And that's reflected in the cases. The Lyle case, and that's cited in our recovery from the U.S. Supreme Court, they point out how inconsistent decisions pose a threat of diminishing reliance on the judiciary. And Lyle actually deals with a similar thing, where the jury case was thrown out, the judge rules on the bench case, and the U.S. Supreme Court says, we're saying we know what the remedy is here. The remedy is you have to vacate that bench decision and send the whole thing back from the trial. And the way it works, then, is that the verdict of the jury gets precedence, because in our constitutional scheme, we care about the jury more than the court or offense. And that the court's bench decision, which is given power over the trust, has to be consistent. So this case goes back for a jury verdict on the will, and if it's no under influence, the judge would follow that. If it's under influence, the judge would follow that for the trust. And that's why count two needs to be vacated. And that's, in the cases we cite, it's very well established. Yes, there are federal cases, but the Illinois law that's in the Caicos Department that we cite, we have a 1970 constitution that adopts the laws of 1970, and this law was well established in the federal common law at the time, and there's the other rule also in Caicos that the Illinois courts will follow the federal application of the analogous Federal Seventh Amendment unless there's a good reason not to. And there isn't any good reason not to. The Federal Circuit calls it a benchmark principle, or I'm sorry, a historic principle. In the Thurmond True case, it's also a benchmark. Just as Mitchell was asking earlier, the trust judgment has to be vacated. Only if the willed judgment is vacated and sent back for trial. Under constitutional grounds, yes. But we do have to argue that the privilege claim under redacted documents is not privileged, and you should still rule, and that that is material evidence that requires a new trial on count one and two, and a further review in camera. I do have one question, and that is, can you address why Lisa's actions didn't fall under the power of attorney? She had a COA as of 2011, and so I don't think the argument was made, but it begs the question as to, wasn't she authorized to take these actions pursuant to the power of attorney that she had? Well, maybe actually she had the legal authority to do, but that's what put her in the position to have the undue influence. That's how the fiduciary rule comes into play for undue influence. That if I'm not in a better position to get the will changed in their favor than the person who's controlling the business and other affairs. In 2014, she's controlling every personal, business, social. She's it for John. That's the caretaker she hired. We'll hear from your partner on the other side, and then we'll hear from you again real quick. Good morning. My name is Eric Brent from Brenner. I'm from Perkins Coie, and we represent the respondent, the estate of John Palmatriski, Jr., and the trust created by John Palmatriski, Jr. that became irrevocable upon his passing in 2014. With me is Deidre Close from Crowe Fairchild. She represents Linda Palmatriski individually. We plan to divide our time by subject. May it please the Court. We propose to address the following points. First is the threshold issue of this Court's jurisdiction and why respondents respectfully submit this Court lacks jurisdiction. Secondly, the presumption of under influence, as that doctrine has developed in the will and trust context, and the position of petitioner is mischaracterizing how this presumption operates. This relates to petitioner's argument to seek reversal of Count 1. Next, we propose to go through whether the trial court needs to defer to a non-jury jury case, whether the trial court needs to defer to the jury before ruling on non-jury issues, and we think petitioner has mischaracterized the applicable law there. This relates to petitioner's grounds for reversing on Count 2, the will context. Then we propose to address the discovery rulings by the trial court, and particularly the Court's correct finding that the inadvertently produced email between me and Domingo Souk and Lisa Palmacherski acting in her capacity as trustee of Annalise's Trust was privileged and sediment communication with respect to the Churchyard case. For those familiar, the Churchyard case is the case that John and Annalise filed in 2012 after getting nowhere in efforts to get access to their cash and control of their own business from their son, John Palmacherski III, who I refer to as JP3. And lastly, we'll address the lack of evidence for any undue influence by Lisa Palmacherski over John. The evidence at the three-week trial in this case was that John wanted to disinherit JP3. They had very good reason to do that. He was in litigation with JP3. The testimony in the record was, yes, a long-running dispute, an animosity with his son. We heard at trial from John's closest relative other than the immediate family, John Bunch, who testified that John, my client, felt very put out when his son took over the business and pushed him aside. We heard from an expert who looked through the medical records, and in there, there were testimonies with John with derogates, where he was complaining about feeling isolated and disrespected by his son and did not know how to respond to it. The record was complete with a long-running dispute that did not manifest into litigation until 2012. But to say that there was no basis is just disregarding the record. Let me first start with appellate jurisdiction, because that's obviously critical to this court. A petitioner did not address the defects in appellate jurisdiction in three ways since his initial notice. We addressed this in our brief, and the reply brief did not address it at all. Did Rule 303A2 cure the premature appeal? Rule 303A2 would have cured premature 303 notices, but each of the notices of appeal were filed as interlocutory appeals. They asserted 304B1. So they cited the wrong rule? Absolutely. And that's fatal? The court held in the Richardson case, that we cite, that 304B1 was defective. It did not constitute as a premature notice of appeal. It's a defective notice of appeal. So there's a material distinction if you file an interlocutory appeal when you don't have an interlocutory right. They never sought a 304A finding. They pursued only 304B1 exclusively. After the final order in June of 2023, they did not file a 303. But we get notices of appeal that don't even cite a Supreme Court rule. They identified the order that was being sought as an appeal. And the fact that they identified the wrong rule, they certainly put you on notice as to what order they were trying to appeal. If 303 has any meaning, if you can't file, you have a right to come up to the court under – When the court ruled on count two, that was the first order, they filed a 304B1. We made a motion to dismiss or alternatively to stay. And this court granted in part that motion and stayed pending a final order. Then there's another interlocutory order, the ruling on count one. They filed another 304B1. It's improper. 304B1 applied to orders entered in the administration of an estate. These are not estate administration orders. We're not paying someone out of the estate who then needs to be finalized so they can get on. These are unrelated to estate administration. These are just in probate. Not everything in probate is in estate administration. So 304B1 is clearly, I think we should be able to agree, is clearly the wrong order. They should have filed under 304A. They got a 304A finding and then filed under 304A? They could have done that, but they didn't. So they couldn't make the final decision? Exactly. They didn't. So you're placing a record where you've got defective, not premature, but just defective notices. And the question is, in my land, I'm not going to change. The history book was here. Then I'll move on. Next I'd like to address the mischaracterization of the presumption of undue influence. So the case law has developed that there's a rebuttable presumption in undue influence cases. It doesn't create a construct where if the presumption is found that a JNOB is not available. At trial, JP3 did not even make out a prima facie case of undue influence. Had he been able to make out a prima facie case, the court said, if you read this, I think very well-reasoned written opinion, and then there's the oral opinion from the bench, and then the written opinion. He assumed he had found it, a prima facie case, but then found it was such overwhelming evidence that the respondents have put in as to John exercising his own free will, that the presumption disappeared. In that analysis, and in your brief, you focus very heavily on the absence of penitentiary evidence during the 2014 time period. But the point that counsel was making is you really have to look far over that. You have to start looking in 2011, 2012, because his period, at this point, they become capped. They definitely weren't capped. They were going wherever they wanted. They saw whoever they wanted to see. They chose not to see JP3 because JP3 had tried to have them declared incapacitated and had them self-appointed, so you have to be careful around someone like that. But in measuring this idea of is there evidence, don't you have to consider the evidence from 2012 and 2013 and not just focus exclusively on that? I don't think the court focused exclusively on 2014, but the fact of the matter is you have to be able to prove it was operative in 2014. And if you had nothing, and the court was aware of what they had. He even talks about it, you know, the Mazen testimony. He just found it not probative, just like in Pedrick. There wasn't nothing on the plaintiff's side in Pedrick. There was testimony. It was all very consistent. It was a little off the mark about whether the lights were blinking or not. And the court found it just wasn't probative. That's the same thing here. Mazen's testimony from 2011, and she was not fired. There was nothing in the record for that. She quit because she was discovered to be spying for JP3. She was making reports back to JP3, which imagine your caretaker is talking to your son that you're having this dispute with. I mean, it's such a huge, you know, she quit before she was, and it was definitely not fired by Lisa. But to, John was, you know, very much in control. Why don't you make the points that John so relied on to show that there's an issue that needs to be resolved by the jury here? He pointed, for example, to the e-mail. He pointed to a number of other things that Lisa was doing. If you could address those questions. Certainly. Again, just like in Pedrick, there was no evidence, but it just was de minimis and not probative. And the court found that it wouldn't, you know, he wouldn't let a jury, had the jury decided, he would have Jan O'Heed it then. And that's why we have judges in jury trials. But here the jury didn't need to prove it. I mean, the only evidence of any actions in 2014 that they appear to rely on in their brief is the e-mail. And the e-mail is very much misconstrued. It is not about John's estate plan. It is, and the e-mail is titled proposal, because I was talking with Lisa, because we were trying to come up, Lisa Palmagerski, we were trying to come up with a settlement proposal for the Churchyard case, and she is a plaintiff in the Churchyard case because she is the trustee of Ann's Trust. So I had spoken with John Palmagerski days before. I speak with Lisa to, again, we're trying to develop a proposal. Lisa writes me back. So the first e-mail is Lisa responding to my conversation about what could we offer in settlement, how do we want to structure this. She includes Domingo Soup, because he was involved in the relationship with her parents. And he responds back that you need to understand what Ann's estate, and indeed that's something I'm going to have to talk about. Ann's estate did a few things. That's Mr. Soup's e-mail. He's discussing Ann's estate with the trustee of Ann's Trust so that she knows what the parameters of the trust of which she operates. It's in the context of settlement, which would, of course, make it inadmissible, even if it was not privileged. But that e-mail is part of a three-e-mail chain. The first one is clearly the settlement proposal. Mr. Soup then instructs the trustee, as trust counsel should do, as to what the parameters of the trust are. And then my first e-mail, the latest in the chain, is mine with an actual draft e-mail to James Carey, who had just taken over from Arnstein & Laird as JP3's counsel. And I knew people at that firm, and Mr. Soup knew Mr. Carey, and we thought it was a good opportunity to try to make this proposal. And it's not talking about John's estate plan. And the comment of Mr. Soup at the end that it's time, you know, that it was that aspect of Lisa, what she did was logistics for John, times coming that her father updated his estate plan. The reason Mr. Soup writes that is he knew well what John wanted to do, because he had spoken with John many times in 2014. That's in the record about his estate plan without Lisa present. He had been in the section of the 2013 estate plan. He had met with John and Annalise about this exact issue. What do you want to do with your estate plan? Did Mr. Soup send some money or references? Yes. And Ms. Park and I just corroborated it. They both met. Ms. Park and Mr. Soup met with John and Annalise at length in 2013 when they started the 2013 estate plan. Mr. Soup testified that he met with John, I think it was in February of 2014. We obviously had many discussions with John about the litigation. And, you know, as happens in a lot of law firms, the estate bills and the litigation, lawyer invoices, and, you know, there was extensive contacts between John and lawyers then at Perkins and Cooley about the litigation. So let me turn to the e-mails. I don't know if you have a – I see you have a redacted document there, and I don't know if that's an unredacted version, but what did the judge review? You know, I am clear that he definitely had the unredacted because we attached that to the brief. And I know the record is not very clear. I believe he – You're saying the judge reviewed the unredacted version? That's not a reference. Again, I say the record – it's not shown as attached to the brief. I know he had it with us, and I can't remember if he – my recollection is, you know, for whatever – it's also the court, but he took it back and went and changed it, and that was the in-camera version. It's not attached to our brief, but I don't – Well, the redacted e-mail presumably would not – I mean, the unredacted e-mail probably would not be attached to the – The redacted e-mail was attached to a copy provided in the chambers, I presume. We had a public copy and a non-public copy. So my question is, why would a judge waste their time reading a redacted e-mail? Agreed, but even the redacted e-mail makes it very plain, especially when you put it into context. What's going on in May of 2014? How clear – I mean, if you don't have the entire document in front of you, then how do you know what's, you know, what's been concealed? I agree. I think – my recollection is we have the unredacted document, but even if he has only the redacted document, it is clear what is going on from the title of the document, from the timing. I mean, this one is a draft. The entirely redacted one is, here is a draft e-mail of a settlement. And the other unredacted e-mail begins, you know, proposal, however, as a follow-up to our conversation yesterday. We're talking – and it goes through how to pitch what concepts to use in settlement. This is a settlement. There is a client, he said as trustee of the A.M. Trust, strategizing on ways to settle a case. And, you know, that was what the e-mail was about. It should never have been produced in redacted or unredacted form, and it had no – and even if it had been produced, it would not be admissible under 408 because it's not a settlement communication very plainly. And it's not subject to the testamentary exception because it doesn't relate. It's talking about the A.M. estate to the A.M. trustee. It's not – and primarily, it's not even planning estate planning. It is settlement planning. How many other issues do you have for us? I'm going to be stepping on this close. Let me briefly address Calc 2. It was on the speed of Calc 2 that the Will Contest, not the Trust Contest, was put to court to decide. The jury was advisory only, and advisory juries are just that. You know, you could take their advice or not. The petitioner does not point in their briefs to any error by the court in a well-reasoned opinion he read from the bench, very detailed. Judge Murphy did a – was a very conscientious judge on this trial. The only attack on Calc 2 appears to be petitioner's contention that it was premature because it must – their view is that Calc 2 has to be consistent with Calc 1. There's just no basis in law to argue that a court cannot decide Calc 2 until Calc 1 was resolved. No basis. This is an abuse of discretion standard. The judge can decide which counts to decide first, how to run, and by allowing – by deciding Calc 2, where he felt there was very overwhelming evidence for Calc 1, is totally within his prerogative. It was that overwhelming evidence that then left him, as we were preparing for a retrial on Calc 1, to come to the conclusion that he could not, no matter what the jury did, allow a verdict in favor of the petitioner to stand. And that was why I think he did a remarkable and thoughtful thing, and he admitted his own error and fixed it. And I guess I'm not sure what time we have left for this closing. I will turn it over to you. Well, we went over in a poem, so we have until four minutes after. No further questions at all. Thank you. Good morning, Justices. My name is Deirdre Close. I am from the law firm Pope, Fairchild, Forte, and Barrett, and I represent Lisa Padmajerkey individually. May it please the Court, we reaffirm the arguments that Eric Branson Brenner has presented, and as you're aware, in the trial court, Lisa Padmajerkey defended against the claim that she unduly influenced her father in connection with his estate and trust documents. As you know, the trial court found that the evidence at trial overwhelmingly established that Lisa's father, John Padmajerkey Jr.'s will and trust were the product of his desires, and the terms were freely chosen by him. Further, the trial court found that the evidence failed to establish that Lisa Padmajerkey exerted undue influence over her father in connection with his 2014 will and trust. In short, the record is replete with evidence that John was a capable, strong-willed, and decisive man who made his own choices. It is also replete with evidence that he was angry and disappointed with his son and his son's refusal to return control over the assets which John and his wife worked their life to amass. And the testimony from the attorneys that John willingly, knowingly, and purposefully directed his lawyers to draft estate plans that would effectively disinherit his son was unrebutted. In contrast, the record lacks evidence of any undue influence by Lisa Padmajerkey over John Padmajerkey Jr. Undue influence is influence exerted upon the decedent which causes him to make a disposition of his property that is not a free and voluntary act. So, I do recognize you've read the record, you've read the brief, but in a reply brief and as counsel stood up here today to reference all of the evidence of Lisa's undue influence in the record, there's a lot that doesn't exist that has been referenced here. I think there's an important distinction between what is a theory based on a story versus what is evidence. If you turn to the record, we have multiple attorneys who testified. They represented John. They followed John's directive and John's wishes. We have the testimony of Jared Powell who was John's lawyer when John and his wife had to resort to filing a lawsuit against Johnny to recover control of their businesses and their cash. He testified regarding the tumultuous relationship between John and his son as John struggled to regain control of his assets. Domingo Souk, the attorney who worked with John to draft his estate plan. He testified that he communicated directly with John regarding his own specific wishes and that John was in control of his estate plan. Souk testified that he had no doubt that the 2014 Will and Trust documents reflected John's wishes. Souk testified that Lisa never asked him to draft the documents and that he did not take direction from her. We have Lucy Park, an attorney who was also involved in the discussion and execution of John's estate plan. She testified that she personally discussed with John the details and impact of his estate plan as related to the issue of what his son would or would not inherit and that John understood with conviction the choices that he was making. Ms. Park testified that Lisa was not present for these discussions or for the signing of the documents. She also testified regarding the instructions given by John which were incorporated into the letter of wishes which was drafted by Ms. Park. The letter fully memorialized John's wishes to disinherit his son as well as his concern that his son would attempt to challenge the estate plan after his death. We also have testimony from the guardian at Lido that was appointed by the court to meet with John to assess John's capacity to control his finances when his son attempted to have him declared incompetent. Mr. Epstein noted John to have deeply held and personal convictions regarding his son, to have an understanding of his financial affairs, noting that he did not trust his son and that he was angry with his son. Johnny's theory is largely based on circumstantial evidence, which often these cases are. Does it matter that the jury, I think the jury deadlocked in this case? Is that significant? Respectfully, we moved for a directed verdict because we did not think that the case should have gone to the jury. And the judge disagreed? The judge disagreed. The jury deadlocked? In reconsideration, it was 11-1 and the jury deadlocked. However, when the judge reviewed the record, when he was entering his judgment on count two, he was looking at all of the witness testimony, and even that testimony that existed regarding Lisa wasn't testimony that she was involved in the procurement of the will. It wasn't testimony regarding her... For example, what about Mesa, M-E-Z-A? Granted, she left in 2012, but what about that evidence? So, Maria Mesa was a longtime friend and employee of Johnny. The court found her not just to be a not credible witness, referred to her as a liar. Her testimony was, in the court's assessment, absolutely not believable. But even so, the court said if we take her testimony, her testimony that she said, and she quoted, that she heard Lisa saying Johnny was a steal guy, and then the other testimony was that she was bugging her father to change his will. Okay? If those two things are true, it still does not get you over the threshold of undue input. And as our...  Well, what in the world does it get you over the threshold? Isn't that enough? In 2011, for a statement to be made that precedes the point in time in which Johnny's parents sued Johnny to regain control of their business. They engage in multiple meetings with their counsel about changing a state plan. They are consistently involved in litigation. And then the mother passes away. The son brings a counterclaim. Two days after his mother passes away, serves a counterclaim, an 80-page counterclaim, claiming both of his parents are engaging in fraud. Serves that on the father right after the mother dies. Father subsequently changes the will. I don't see how Maria Meza's comment, which so far preceded all of those circumstances, is probative. And the judge found so as well. I mean, ultimately, the judge being able to preside over the trial and assess the credibility of the witnesses, when it is so overwhelmingly not in the favor of the move-ins or the non-move-ins, you would never have a situation where you could have a directed verdict if the judge can't make those credibility determinations. This isn't an issue of the judge making credibility determinations on all of the witnesses and saying, okay. So if it was a bench trial, I would tend to agree with you, but if it's a jury trial, you talk about credibility of witnesses, how much can a judge do that under the PEDRAC standard? If the judge found that there is absolutely no basis for credibility in the witness and that the witness's testimony is not probative, I mean, if you look at the PEDRAC standard, there's testimony regarding the flashing lights as they're approaching the railroad tracks. And there's some witnesses that say, I think there were flashing lights. And there's some that say, I don't recall if there were flashing lights. There's inconsistencies. And under the PEDRAC standard, they were saying that the rule was that if there's no circumstance under which the case could be upheld on the evidence that's presented, then if there's no contrary verdict could stand, then you can enter a directed verdict. Now, even if our expert on undue influence, Dr. Shima, she was explaining that in the field of undue influence, if a child says, hey, mom, I want you to give me the house. I'd really like you to give me the house. That's not undue influence. That's not somebody wanting something. So even if Lisa had said, which we can test, but even if she had said, dad, I want you to change the will, how is that undue influence? How does that cross the threshold to be undue influence? And then, again, this far preceded, this alleged statement, far preceded all of the acts which led up to the ultimate disinheritance in 2014. I think you're down to your final minutes. Okay. Again, just to comment on some of the comments made by Petitioner's Counsel, Lisa's interference or purported interference with the attorney-client relationship of the gang is a theory. There is no evidence to support that. It is simply a theory. John did not proceed with Attorney the Gang. He proceeded with Domingo Soup. He retained Domingo Soup. In terms of the testimony that the parents didn't want Mr. Soup, there's no evidence of that. In terms of the testimony that Lisa shut down the gang relationship, no evidence of that. In terms of the parents cracking under pressure to retain Domingo Soup, there is no evidence of that. And the blatant statement that there was no history of problems between John and his son, Johnny, is defied by extreme amounts of evidence within this record. Respectfully, we would request that the court affirm the rulings below on counts 1 and 2. And in light of the rulings on counts 1 and 2, the court should also affirm the dismissal of count 3 on the basis of lack of standing. Thank you.  Thank you. So on the directed verdict, and their argument, which mirrors what the trial court found, it credits Lisa's own counsel, Perkins Coie's attorneys, and the McDermott Will, Mr. Cloud, he also testified, their testimony. This isn't direct coming from John. Yes, there's a July 29, 2014 letter that John signed. It's legalese. Ms. Park, the attorney, drafted it. And what happened here in granting the directed verdict is their argument, well, it's not probative enough. But what they're really arguing is that weighting the evidence is okay. You know, the case isn't good enough. We're on pederick, we're on directed verdict. It's judgment as a matter of law where there's no evidence to sustain a verdict. And that does not allow weighing of evidence. You know, what we contend here in rebutting the attorney's testimony, and it's attorney's testimony about litigation. And there's lots of evidence. John didn't have any clear idea what was going on in this litigation. In the trial courts... What is that evidence? Oh, what is that evidence? That John didn't understand what was going on in the trajectory? Right, well, Ms. Park takes a stand and says, well, John said, why did I do anything? My son was suing me. Right, well, in his name the suit was filed by him against his son. And we know there's a principle argument of, you know, the guardian and the... And John is not involved in litigation. Lisa is involved in litigation. The lawyers are dealing with Lisa, not John. And the trial court credits Mr. Sue, Ms. Park, and he credits the documents. Well, Lisa's involved in the churchyard litigation in her capacity as trustee, right? A man's trust. She's had multiple ads, and I'm not sure what they say. Again, she's a trustee. She's got general partnership roles. She's a special assistant in things. I mean, what the reality is is that Lisa is in charge. She's the one dealing with the attorneys, not John. John is in the dark. That's our contention. The attorneys testified that Lisa was not involved in any discussing points about changing the will or the state. I mean, that's unrebutted, right? No. I mean, they suggest, they say, that her involvement is ministerial in the estate plan. Early on, there's e-mails where she prefaces it, and the court relied on some of this. That, well, my parents want this, my parents want that. And he credits that as being the true intent of the parents when it's only coming from Lisa. It's not corroborated by anything from the parents. Those attorneys, the Perkins crew is attorneys, testify. They represent Lisa in this case, in this room. They're her attorneys. And Lisa was instrumental. She's the one that got Mr. Suk involved, first in McDermott and now at Perkins, in what's been a very lucrative relationship. They have interests. There's no matter of law that those lawyers must be believed by a jury. And there's more. Mr. Suk, on the stand, testified about calls and meetings that he had with the parents. But there's impeachment. This is in our brief, pointing to the record. There's one example. There's a claim that it was February of 2013, there was a meeting, and that's where John wants to disinherit John. And then there's a July set of documents that relate to that. And then, you know, again, of course, July 2014. And Mr. Suk, he had a practice that he took notes of these important meetings, but there's no notes of this one. And then we go to 2014. There's testimony from Ms. Park and Mr. Suk about communicating with John after the July 2014 will. But the bills don't reflect any of that. There's no documentation of anything. Ms. Park shows up July 29 with that letter to get signed. And I think her testimony was, oh, this was some back and forth with John. But John couldn't hear. You can't call him on the phone and talk about a letter, about trusts and things. That sort of stuff didn't happen. And the real key for the trial court was saying, John, it was hard of hearing. Yeah, yeah, that's well documented in the papers here. Well, counsel, can you also indicate what other evidence was there of his lack of capacity to, you know, be involved in, you know, these legal matters and to, I guess, oversee what Lisa was doing? Well, we certainly have a brief about the history of his involvement in his business. He did the properties, you know, the rehab and things like that. It was Annalise, the mother, who died in 2013, who handled all the business stuff, including dealing with Johnny over Johnny's management of properties, which was, again, there's nothing in the record that they had any dispute with Johnny about his management. But I'm referring to John's lack of capacity. Well, John has never been involved in the business aspect. But it doesn't mean he's not capable. Well, this is not a lack of capacity case. It's an under-influence case. Yeah.  And Lisa, our contention is that Lisa turned John against Johnny. And that, you know, re-emphasizes testimony in 2011. Johnny is a steel guy. The trial court didn't like that because she has bad English. He says, oh, there's no way that Lisa would say Johnny was a steel guy. Well, of course. Lisa speaks probably perfect English, and this means that they didn't. But he just can't be discarded. It can't be discarded as a matter of law. Well, with that, I think we're done for five whole seconds. Okay. And I will mention the email one more time. So we weren't attached to any motion in 2020. The briefs touched the record of how this was dealt with. This was added to the record by motion that we filed during the appeal phase. And this is the document that he reviewed, right? He was absolutely behind the redactions, and he refused to do it. You know, he said there's no rational reason to do it. He wouldn't do it. And so at the time, I mean, that would seem to undermine the entire purpose of an in-camera review. Why would a judge review what you folks already have? Well, because they wanted to talk back. They wanted us to not have it. So he ruled that we had to do it from both sides. So why does a judge need to review? I mean, you can make your argument. As a trial judge, when you're faced with a test that's doing an in-camera review, it's such a burden. Anyone who's done it will understand. And I'm just struggling to understand why a judge would waste his time reviewing a redacted document to determine whether a claim of privilege is valid or not. Because there was an immediate issue of this document that had been produced, and they wanted to call back, and there's rules providing for that. Because it's the unredacted portion, which is the part that is subject to privilege. Correct. That's it. That's it. And so the unredacted portion, that's the subject of privilege. That's correct, Your Honor. So everything that's redacted, there's no issue about privilege there. Well, that somehow stopped Friday. We asked to have the trial court on remand be directed to do more review. Mr. Sue, the estate planner, his name is all over the supposed litigation documents, including this one. It's not litigation, but he's targeted. And that requires a review. So we do want the in-camera review to go beyond. But this specific exhibit, this one that I gave, you know, suffe3621 is the top page of the e-mail. This is the document that the trial court reviewed because the unredacted part was a claim of privilege being decided. He sustained it. We say it was error. And we also want to put that back to go beyond. So your opponent says that it was a completely unredacted document that he believes the court reviewed. And you're saying that's not the case. It was that document that's in your hand and that the part that's redacted we need not concern ourselves with because what was at issue was the unredacted portion of the document. That's correct, Your Honor. We moved to the trial court, and they didn't say no to some other document that was at issue. It's this document. Thank you. Okay, thank you, counsel, and counsel for both sides. I want to commend you on an excellent argument here today, and the briefing was outstanding, and that'll be taken under advisement for ruling. Your respective clients should, no matter how you feel about it, they should know that they've been very capably represented. We thank you for retaining such very fine lawyers. Court adjourned.